AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture  AUTHORIZED AND APPROVED/DATE:    s/Nick Coffey 3/21/2024

# UNITED STATES DISTRICT COURT
for the

WESTERN DISTRICT OF OKLAHOMA

In the Matter of the Seizure of )
The cash value of the contents of Bancfirst )
Account Number 4090171622, )  Case No: MJ-24-242-STE
in the name of EA Pando Investments, LLC, )
maintained by Bancfirst, )
100 North Broadway, Oklahoma City, Oklahoma 73012. )

## APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Michael Adams, a federal law enforcement officer for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property is subject to forfeiture to the United States of America under 18 U.S.C. § 981(b) and 28 U.S.C. 2461(c), as incorporated by 21 U.S.C. § 881(b), 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C); 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1), for violations of 21 U.S.C. §§ 846 and 881(a)(6); and 18 U.S.C. §§ 1956 and 1957:

> The cash value of the contents of Bancfirst Account Number 4090171622, in the name of EA Pando Investments, LLC, maintained by Bancfirst, 100 North Broadway, Oklahoma City, Oklahoma 73012.

The application is based on these facts:

See attached Affidavit of Special Agent Michael Adams, of the Federal Bureau of Investigation, which is incorporated by reference herein.

☒ Continued on the attached sheet.

_____
*Applicant's signature*

Michael Adams, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: March 21, 2024

_____
*Judge's signature*

City and State:  Oklahoma City, Oklahoma

Shon T. Erwin, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF THE CONTENTS OF BANCFIRST ACCOUNT NUMBER XXXXXX1622 IN THE NAME OF "EA PANDO INVESTMENTS LLC" | Case No. MJ-24-242-STE<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEIZURE WARRANT**

I, Michael Adams, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I have been a Special Agent with the FBI since March 2015. I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating, among other things, the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. Through my training and experience, I have become familiar with the methods and operation of drug distributors, including their common organizational structures, use of violence, methods of manufacturing, distributing, storing, and transporting drugs, and methods of collecting and laundering drug proceeds. As part of my investigative experience as an FBI Special Agent, I have been the affiant in multiple Title III wire intercept

affidavits, executed search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs, and spoken with informants and subjects, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

2. The facts set forth below are based upon my own personal observations, reports and information provided to me, other documents obtained during the course of this investigation. All of the below-described dates and times are approximate.

3. The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure the requested search warrant; therefore, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to that establish probable.

## PROPERTIES SUBJECT TO FORFEITURE

4. The United States submits this Affidavit in support of forfeiture of the following accounts:

    a. contents of BancFirst account number 4090171622 in the name of EA Pando Investments LLC, maintained by BancFirst, 100 North Broadway, Oklahoma City, OK, 73102 ("**SUBJECT ACCOUNT**");

## BASIS FOR SEIZURE

5. Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853(f) permits the Government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

6. This Application seeks seizure warrants under both civil and criminal authority because the property to be seized could easily be placed beyond process if not seized by warrant, as money is fungible and easily dissipated.

7. The United States alleges that the **SUBJECT ACCOUNT** is subject to forfeiture to the United States because it is property that is involved in money laundering and drug conspiracy, is used or intended to be used to facilitate the commission of this criminal activity, and includes proceeds of unlawful drug activity or proceeds traceable to unlawful drug activity in violation of the Controlled Substances Act. Specifically, the United States alleges that the **SUBJECT ACCOUNT** is forfeitable to the United States

pursuant to its use and involvement in violations of 18 U.S.C. §§ 1956 and 1957 (money laundering) and 21 U.S.C. § 846 (drug conspiracy).

8. Title 18, United States Code, Section 1956 makes it a crime for any person to engage in laundering of monetary instruments.

9. Title 18, United States Code, Section 1957 makes it a crime for any person to engage in monetary transactions in property derived from specified unlawful activity.

10. Title 21, United States Code, Section 846 makes it a crime to conspire to violate a provision of Title 21 and provides that any person who attempts or conspires to commit any offense defined in that subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## BACKGROUND ALLEGATIONS REGARDING DRUG CASES AND MONEY LAUNDERING

11. As discussed previously, I am, based on my training and experience, as well as the training and experience of other investigators in this case with whom I have consulted, familiar with the *modus operandi* of drug trafficking organizations (DTOs). I am also familiar with the many ways in which DTOs will attempt to launder their illicit proceeds. Based on my training and experience, and participation in other money laundering and drug-related investigations, I know the following:

a) I am aware that money launderers connected to DTOs frequently keep assets, records, documents related to their transfer activities, and monies derived from the sale of illegal narcotics at private residences and businesses, sometimes acting in a "shell" capacity, where they are not easily detectable by law enforcement officials conducting investigations, and further that these individuals will frequently maintain these locations in the name of other individuals, also to avoid detection by law enforcement agencies;

b) I am aware that money launderers connected to DTOs often own and operate seemingly legitimate businesses, sometimes hidden within larger businesses, and that money launderers often commingle lawful monetary transfers with unlawful transactions;

c) I am aware that even though those businesses and properties are under an alias or other persons' names, money launderers continue to use and exercise dominion and control over them;

d) I am aware that money launderers connected to DTOs often maintain on-hand quantities of currency, often derived from unlawful activities such as drug-trafficking, in order to methodically transfer the funds, sometimes by "structuring", often over prolonged periods of time, to avoid law enforcement detection, financial reporting requirements, and the additional scrutiny that using a bank invites;

e)  I am aware that money launderers connected to DTOs maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the receipt, transfer, and storage of financial instruments related to unlawful activities, even though such documents may be in code. It is particularly common that individuals engaged in money laundering connected to DTOs will keep ledgers related to their illegal activity because drug dealers commonly deposit large amounts of currency, often multiple times per week, and the money launderers often deal with more than one DTO at any particular time;

f)  I am aware that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the money launderers have ready access to them, i.e., homes, automobiles, businesses, and safe houses, and that the most common place for these items to be located is at the businesses used to execute the unlawful monetary transfers. Further, I know that money launderers associated with DTOs often keep these records for significant periods of time, as sometimes an accounting can be required.

g)  I am aware that money launderers connected to DTOs will frequently keep records, notes, ledgers, contact lists, and other evidence of their financial dealings with DTOs on cellular phones, and that they often keep such cellular phones on their person or in the properties that

they control. I am also aware that money launderers connected to DTOs will use computers and tablets to further their financial businesses using digital communication, including, but not limited to, e-mail and instant messaging;

h)   I am aware that it is common for money launderers connected to DTOs to conceal contraband, proceeds of drug sales, and records related to drug proceeds or drug proceeds transfers in secure locations within residences, garages, storage buildings, safes, and safety deposit boxes for ready access, and also to conceal such items from law enforcement agencies;

i)   I am aware that to accomplish the overall goals of distribution of currency for DTOs, money launderers utilize, including but not limited to, banks and their attendant services, securities, cashier checks, money drafts, letters of credit, brokerage houses, real estate companies, shell corporations, and business fronts;

j)   I am aware that money launderers connected to DTOs commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers for their DTO associates, as well as those that assist in their financial transactions, even if said items may be in code.

## **PROBABLE CAUSE**

12. As explained herein, the **SUBJECT ACCOUNT** is being used by Ever Pando (**PANDO**) in furtherance of drug and money laundering conspiracies led by a Mexico-based DTO.

13. Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond. During the investigation, which utilized Title III wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine. These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP. Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network. During that portion of the investigation ("Phase 1") investigators uncovered a massive methamphetamine distribution network led by Hernandez.

14. Phase 1 established that Hernandez, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in drug proceeds—all at

Hernandez's direction. Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply, whom cooperators identified as "Mamisan". Law enforcement also found evidence indicating "Mamisan" was the individual responsible for coordinating the shipments of liquid methamphetamine from Mexico to Oklahoma; the investigation established that the methamphetamine was being transported in the fuel tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion.

15. As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see* United States v. Hernandez, CR-21-76-SLP), members of his incarcerated customer base (*see* United States v. Baswell, CR-21-77-SLP), and two truck drivers (*see* United States v. Cedillo, CR-21-288-

9

SLP, and United States v. Lucio, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential human source (CS1)[1]—that law enforcement launched the second phase of the investigation into the DTO described herein.

16. Since phase two of the investigation launched, law enforcement has once again identified new locations where a semi-truck delivers liquid meth, along with multiple rural clandestine lab locations.

---

[1] CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

17. One of the private locations the DTO has used to receive shipments of liquid meth is 701 SE 29th Street, Oklahoma City, Oklahoma—a more than 5,000 square foot warehouse with large garage bay door access, owned by EA Pando Investments LLC (the "29th St. warehouse"). Ever Pando (**PANDO**) is the owner and registered agent of EA Pando Investments LLC. Law enforcement has recorded members of the DTO receiving shipments of liquid methamphetamine at the 29th St. warehouse throughout this investigation. For instance, on November 17, 2023, United States District Judge Jodi W. Dishman for the Western District of Oklahoma, issued two orders—the first authorizing the interception of oral communications inside the 29th St. warehouse and the second authorizing the continued monitoring and recording of visual, non-verbal conduct inside the same location. With that authorization, law enforcement observed two deliveries of liquid meth inside the 29th St. warehouse, the first on November 17, 2023, and the second on December 6, 2023. On both occasions, a black 2015 Cascadia Freightliner with a "DARE Express" emblem on the side and no trailer attached (the "black semi-truck")[2] pulled into the large middle garage bay of the 29th St. warehouse. Once inside, two individuals—Edgar Rodriguez Ontiveros (Rodriguez) and Jose Equihua (Equihua)—extracted the liquid meth from inside the passenger side

---

[2] This semi-truck was issued to Dare Express LLC at 1111 Champion Drive, Donna, Texas. Dare Express is a trucking company owned by Denis Gutierrez, believed to be Nelly's husband.

11

fuel tank of the black semi-truck into a large IBC tank housed inside of a black, pull-behind trailer. Also on both occasions, the liquid meth inside the black, pull-behind trailer, was later transported to the DTO's clandestine conversion lab at 980801 S Stage Coach Drive, Wellston, Oklahoma—a rural, five-acre property also owned by EA Pando Investments LLC that has both a residence and a detached garage (the "Wellston lab").

18.   On December 8, 2023, two days after the apparent liquid meth delivery at the 29th St. warehouse, a search warrant was executed at the Wellston lab. Law enforcement found a fully functioning meth conversion lab, recovered more than 1000 lbs. of liquid and crystal meth[3], and arrested both Rodriguez and Equihua.

19.   The 29th St. warehouse was purchased by EA Pando Investments on September 7, 2022. This purchase was facilitated by a $546,314.52 wire transfer from the **SUBJECT ACCOUNT**.[4] At the time of purchase, all three garage bay doors on the front of the building were twelve feet high. Shortly after the purchase, a modification was made to the middle bay door, thereby raising the clearance to more than twelve feet to allow a semi-truck to enter

---

[3]   Field tests resulted in presumptive positives, but official results from the DEA lab in Dallas, Texas are still pending.

[4]   At least a portion ($366,000) of this wire payment appears to have been facilitated by an advance from a line of credit account EA Pando Investments has access to.

the building, which indicated to law enforcement that the 29th St. warehouse purchase was specifically made using the **SUBJECT ACCOUNT** to facilitate the DTO's drug distribution.

20. Based on the investigation, I also believe **PANDO** was fully aware and authorized this modification. Pursuant to a court-authorized search warrant, law enforcement has searched the contents of **PANDO's** cellphone. The phone contained a conversation over WhatsApp—an encrypted communication platform—between **PANDO** and an unidentified male (UM1) at (816) 562-6758. On October 18, 2022, UM1 inquired about raising one of the garage bay doors.[5] On October 20, 2022, **PANDO** indicated the cost to modify the garage door would be $2,600 and provided the contact information for Jose Herrera (Herrera) as the person to complete the modification.[6]

21. Another WhatsApp conversation discovered on **PANDO's** cell phone, this time with another unidentified male (UM2) using the Mexican phone number 52-554-548-4825, provided other evidence that **PANDO** is

---

[5] The conversations between Pando and UM described herein were originally transmitted in the Spanish language. These conversations have been translated by an FBI linguist. The descriptions of these conversations are, in turn, your affiant's interpretations of those conversations based on these initial translations provided by the FBI linguist. This is true for all other conversations described herein by other parties.

[6] During a covert search of the 29th St. warehouse on September 22, 2023, law enforcement found a business card attached to the modified garage bay door for "Jose's Garage Doors LLC".

13

depositing the DTO's proceeds into the **SUBJECT ACCOUNT** via cash deposit. In that conversation, on September 29, 2023, **PANDO** provided UM2 with a balance of $11,217.37 for the "warehouse, yard, and ranch"—which law enforcement believes is in reference to the 29th St. warehouse and the Wellston lab. In addition, **PANDO** told UM2 he would send an account statement via his secretary, whom law enforcement knows to be Veronica Gonzalez Martinez (Gonzalez) on October 2, 2023. It appears that account statement was sent and the DTO paid back **PANDO** and Gonzalez: two days later, on October 4, 2023, Gonzalez made a $11,217 cash deposit into the **SUBJECT ACCOUNT**. Based on my training, experience, and knowledge of the investigation, I believe that these were drug proceeds provided to **PANDO** as either payment or reimbursement for expenses paid for the 29th St. warehouse and the Wellston lab.

22. After the search warrant at the Wellston lab and Rodriguez's and Equihua's arrests, law enforcement also searched the contents of Rodriguez's cellular telephone. In that cell phone, law enforcement found a WhatsApp conversation between Rodriguez and Gonzalez[7]—Pando's employee. On November 29, 2023, Gonzalez sent Rodriguez a screen shot of a combined invoice that including rent for the "Wellston Rancho", "701 SE 29th", and

---

[7] The phone number associated with this conversation was (580) 483-7959. AT&T provided the Billing Party for this account as Ever A Pando Uribe and the User Information as Veronica Gonzalez.

14

various utilities/fees totaling $10,765.51. The conversation continued in which Rodriguez coordinated with Gonzalez to drop of the money owed the morning of Saturday, December 2, 2023. A surveillance camera placed in the area of 4720 S Western Avenue, Oklahoma City, Oklahoma (EA Pando Investments LLC's business location) captured the meeting on this date. At 8:12 a.m. a red pickup truck arrived in the parking lot. At 8:24 a.m. a silver SUV arrived, and a female (presumably Gonzalez) got out and entered the business. At this same time, Rodriguez exited the red pickup truck and approached the business. Rodriguez returned briefly to the truck, approached the driver side door, and retrieved what appeared to be a white envelope before returning to the business. Equihua followed Rodriguez into the business. At 8:30 a.m. Rodriguez and Equihua both exited the business, got into the red pickup truck, and departed. Two days later, on December 4, 2023, Gonzalez made an $11,110 cash deposit into the **SUBJECT ACCOUNT**. Based on my training, experience, and knowledge of the investigation, I believe that at least $10,765 of this deposit were the drug proceeds provided to Gonzalez by Equihua and Rodriguez, two of the DTO's conversion lab workers.

23.  Moreover, I believe these were not the first two cash deposits into the **SUBJECT ACCOUNT** that consisted of the DTO's drug proceeds. On June 6, 2023, a $12,000 cash deposit was made into the **SUBJECT ACCOUNT**. The deposit slip's memo line read, "Wellston payment"—

indicating to law enforcement this was another combined payment for both the Wellston lab and the 29th St. warehouse. There were also other cash deposits made near the beginning of months both before and after this June 2023 deposit, including $10,000 on September 8, 2022, $10,038 on October 4, 2022, $10,325 on November 1, 2022, $7,000 on December 5, 2022[8], $10,540 on January 4, 2023, $11585 on February 1, 2023, $12,400 on March 1, 2023, $12,000 on April 3, 2023, $12,000 on May 1, 2023, $12,000 on June 2, 2023, $12,500 on July 3, 2023, and $12,540 on August 1, 2023. These cash deposits, including those on October 4, 2023, and December 4, 2023, totaled $155,455. Though the deposit slips for these cash deposits did not provide any information in the memo section, I do not believe that these cash deposits were legitimate proceeds from EA Pando Investments LLC. Law enforcement obtained records for the **SUBJECT ACCOUNT** between December 2021 and August 2023. In that time, the above-described cash deposits are the only ones between $7,000 and $13,000. And they begin, not coincidentally, the day after **PANDO** purchased the 29th St. warehouse and account for every month going forward.

24.     Further, **PANDO**'s interview with law enforcement leads me to believe these deposits are drug proceeds provided by the DTO to pay for the

---

[8] Although $7,000 is significantly lower than that the approximate amount for all other cash deposits, it just so happens to be the agreed upon price for the 29th St. warehouse according to the invoice Gonzalez sent to Rodriguez in November 2023.

16

29th St. warehouse and the Wellston lab. Law enforcement interviewed **PANDO** on December 8, 2023—the day the Wellston lab was searched—about the meth conversion lab found at his property. During this interview, **PANDO** indicated that the Wellston lab and the 29th St. warehouse were rental properties in which the renters paid cash. **PANDO** identified one other renter that leased a two-and-a-half-acre property that paid cash[9], but indicated all other renters used electronic fund transfers. **PANDO** also indicated the last time he went to the Wellston lab was in October 2023 to clean up the property in preparation for an appraisal. He also stated that when he visited the property, he never went inside the garage—the location law enforcement found the meth conversion lab. Based on my training, experience, and knowledge of the investigation, I believe that **PANDO** was well aware of the meth lab inside the garage. When law enforcement searched his phone, they found a WhatsApp conversation between **PANDO** and Rodriguez, who was using (405) 977-9919[10]. On October 18, 2023, **PANDO** told Rodriguez the "inspection"— which I believe was a reference to the upcoming appraisal—was set for Thursday. Rodriguez responded the following day asking if they (presumably

---

[9]     Law enforcement has not been able to identify the specific two-and-a-half-acre property that **PANDO** was referencing here.

[10]    Law enforcement knows this to be Rodriguez's number because a cellphone using this number was seized from Rodriguez during his arrest on December 8, 2023.

17

Rodriguez and Equihua) could go to the property that day. **PANDO** told him, "There's no problem . . . Just keep the garage closed". I believe this was additional evidence that **PANDO** knew about the meth lab in the garage and was directing Rodriguez to keep the appraisers out of that area.

25. Based on my training, experience, and knowledge of the investigation, I believe that the **SUBJECT ACCOUNT** has been and is presently being used to facilitate drug trafficking and money laundering and conceal proceeds of these activities.

## CONCLUSION

26. Based on the foregoing facts and circumstances, I believe that probable cause exists that **PANDO** has violated 18 U.S.C. §§ 1956 and 1957 (money laundering), as well as 21 U.S.C. §§ 846 (drug conspiracy) through use of the **SUBJECT ACCOUNT**. Consequently, there is probable cause to believe that the **SUBJECT ACCOUNT** is subject to seizure pursuant to 18 U.S.C. § 981(b) and 28 U.S.C. 2461(c), as incorporated by 21 U.S.C. § 881(b), 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C); and 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1), for violations of 21 U.S.C. § 846 and 18 U.S.C. §§ 1956 and 1957.

27. Therefore, it is requested that the FBI or the United States Attorney's Office for the Western District of Oklahoma be authorized to effect the seizure of the contents of the **SUBJECT ACCOUNT** by directing the

financial institutions to liquidate some or all of the contents of the accounts at one or more times and upon any liquidation of any contents, turn over the cash value of the liquidated contents to the FBI.

**FURTHER THE AFFIANT SAYETH NOT.**

I declare under penalty of perjury that the foregoing is true and correct this 21st day of March 2024.

_____
Special Agent Michael Adams
Federal Bureau of Investigation (FBI)

Subscribed and sworn to before me this 21st day of March 2024.

_____
Shon T. Erwin
United States Magistrate Judge